MUTUAL LIFE INSURANCE COMPANY OF NEW YORK *v.* RICH-
MOND D. HERRON.

1. PRINCIPAL AND AGENT.   *Subagent.*
    A principal is bound by the acts of his agent, within the scope of the
    agency, performed by a subagent where it was understood that
    the agent should carry on the business by others, or the nature of
    the agency made subagents necessary.

2. SAME.   *Life insurance.   General agents.*
    General agents of insurance companies, authorized to contract for
    risks, receive and collect premiums and deliver policies, may con-
    fer upon subagents authority to exercise the same powers.

3. SAME.   *Creditor's acceptance of agent's note.*
    The mere acceptance by a creditor of the note of an agent of his
    debtor for his debt does not release the principal.

4. SAME.   *Binding receipt.   Embezzlement.   Extension of time to agent.*
    Where a life insurance solicitor received money, the first premium,
    from an applicant for insurance, and issued the company's binding
    receipt obligating it to return the money if the application was
    not accepted, and sent the application to the company as one upon
    which nothing had been collected, himself using the money, and
    the company declined the application and returned it to the solic-
    itor with instructions to notify the applicant of its rejection, and
    the solicitor then confessed his embezzlement to the applicant, and
    requested time within which to raise the money to pay him, and,
    without the knowledge of the company, time was granted, and the
    solicitor's note accepted by the applicant, the company, the note
    being unpaid, was not released from liability on its binding re-
    ceipt.

FROM the chancery court of first district, Hinds county.

HON. HENRY C. CONN, Chancellor.

Herron, the appellee, was complainant in the court below;
the insurance company, the appellant, was defendant there.

The suit was an attachment in chancery. The court below decreed in favor of complainant, and the defendant insurance company appealed to the supreme court. The facts were as follows: An insurance solicitor, one Bradfield, appointed by Willcox, the general agent of the appellant for the state of Alabama, and one Leach, Bradfield's assistant, interviewed Matthew Clay, who resided in Noxubee county, this state, and Clay expressed a willingness to make application to appellant for a $10,000 life insurance policy on his life. Clay, however, did not have the money ($322) with which to pay the first premium, but applied to Herron, and. an arrangement was made between them, to which the solicitor assented, by which Herron was to advance the money, and the application was to be made to the company for a policy, of which seven-tenths was to be payable, on the death of Clay, to Herron, and the balance to Clay's children. Herron paid the $322 to Bradfield, the solicitor, and Clay's application was framed as had been agreed. Upon the payment of the money, the solicitor issued what is called in insurance parlance a " binding receipt" for said sum. It acknowledged the receipt of the money and, among other stipulations, provided that in case the application should be rejected the money would be returned upon surrender of the receipt. The receipt was to Matthew Clay, and of course the conditional obligation to return the money was to him; but there was indorsed at the foot of the instrument an acceptance in these words: " I accept the provisions of the above receipt," signed by Herron. Clay was made a defendant to the suit, and answered, disclaiming all interest, and admitting Herron's right to the receipt. Bradfield, having so collected the first premium, did not send the application to his principal as one that had been paid upon in advance. This he should have done, and he should have sent the money along with the application. He did, however, send in the application as one upon which nothing had been paid in advance. The application was forwarded by Willcox to the company at New York in the same way, as

one upon which nothing had been paid.    Willcox was without knowledge of the payment, and acted in good faith upon the idea that payment had not been made.

Several weeks after Willcox had forwarded the application to the home office, he incidentally learned of the payment, when he promptly demanded, by letter, of Bradfield (who lived at a distance from him) that he pay the money to him, as he should have done when the application was sent to him.    Willcox did not then learn of Herron's connecton with the affair, and supposed the payment had been made by Clay.    This demand was by letter, and it was repeated several times before any answer was received from the solicitor.    In the meantime the company rejected the application for insurance, and Bradfield informed Willcox that he would at once refund the money to Clay, the appellant, Willcox being yet ignorant of Herron's connection with the matter.    Shortly thereafter the solicitor informed Willcox that he had arranged the matter with the appellant, and Willcox regarded the transaction as closed until March, 1898, seven months after the issuance of the binding receipt, when he received a letter from an attorney representing Herron, demanding payment.    In the meantime Willcox claimed to have made several settlements with Bradfield, and paid him money (how much does not appear) which he would not have paid had he been advised of the failure to return the money mentioned in the receipt, upon which this suit is based.    The company itself had no knowledge of the affair, save only as Willcox's information charged it with notice.    After the rejection of the application for insurance, Bradfield and Leach had an interview with Clay and Herron, and notified them of the rejection of the application.    This was the whole of it so far as Clay was concerned.    In respect to the interview with Herron, Bradfield and Leach executed and delivered, and Herron accepted from them, their promissory note for $322, the amount of the premium, due sixty days from its date, bearing eight per centum per annum interest.    After accepting the note, Herron

remained quiet during the sixty days until the note matured, and, when it was not paid on demand, he granted Bradfield and Leach a further extension of thirty days, and, during this further time, he did not give the insurance company or Willcox knowledge of the dereliction of Bradfield and Leach, and it was during this ninety days, the period of Herron's silence, that Willcox claims to have made settlements with Bradfield. At the end of the ninety days Herron, or his attorneys, began corresponding with the officers of the appellant, demanding payment. Herron testified that, when Bradfield and Leach came to see him, after the rejection of the application for insurance, they told him that they had spent the money and wanted him to wait until they could get it up before presenting the matter to the company; that, if he applied to the company then, it would get them into trouble, and they asked, as a personal favor, that the matter be held up for a while, to give them a chance to refund the money to him themselves, and that, thereupon, he took their note at sixty days, and afterwards extended the time for its payment for thirty days additional, but did not agree, nor did he intend, to release the company. Bradfield and Leach were and are insolvent.

*R. P. Thompson* and *Mc Willie & Thompson,* for appellant.

Upon Herron's own version of the facts the decree appealed from is erroneous, and the court below should have dismissed the suit. He says that Bradfield and Leach informed him that they had used the money, and that it would place them in a bad attitude with the company if he demanded immediate payment, and asked him, as a personal favor to them, to give them sixty days in which to pay him, and to take their note for the sum. To this Herron assented, and he did accept their note, and remained quiet. Of course, Herron, by implication if not expressly, consented to suppress the fraud of the insurance solicitors. He afterwards extended the time to ninety days, and during the whole time was under obligation to keep quiet, and

he did keep quiet.   We have, therefore, a case in which a cred-
itor dealing with the agent of his debtor, with full knowledge
that the agent has perpetrated a fraud on his principal, used
the very money which should have been paid to him, confeder-
ating with the unfaithful agent for the express purpose of en-
abling the agent to suppress his delinquency and keep from the
principal knowledge of the default.   Surely, when a creditor
dealing with an agent of his debtor, with knowledge that he
has been unfaithful to his principal, confederates with him to
wrong the principal, such creditor places himself on a low
moral plane and occupies a poor position to resist the applica-
tion of rigid rules of law.   He comes into court with unclean
hands, at least, and in a court of conscience deserves but little
commisseration.

The question before us is not one of novation in the ordinary,
but is one in an exceptional sense.   The law of agency is also
involved.   Meacham, in his work on Agency, sec. 699, in dis-
cussing the liability of an undisclosed principal, has this to say,
which is decidedly applicable to this case:  "But where the
creditor, with knowledge of the principal's liability, sees fit to
take the individual note of the agent, without taking, at the
time of the transaction, any steps indicative of an intent to hold
the principal, this is equivalent to a discharge of the principal
as a matter of law.   And the case is much stronger where, after
the taking of the note and before any claim is made upon the
principal, the latter had paid, credited or settled with the
agent."   Could anything be more directly in point?   It does
not weaken the application of the rule announced in the above
quotation that the author is discussing the law of undisclosed
principals.   He is treating of the creditor's acts after the cre-
ation of a debt, and after knowledge that the party with whom
he dealt is an agent of a disclosed principal.   In other words,
the author is treating of the acts of a creditor whose debt is in
existence and who has been informed not only of the existence
of a principal, but his identity as well.   Again, in 16 Am. &

Eng. Enc. L. (1st ed.), 881, we read, "Where a creditor takes the note of an agent, with knowledge of the liability of the principal, the debt is regarded as paid." Mind you, this is the announcement of a general rule, and would seem to cover cases in which the making of the note itself might be regarded as an act of agency. In the case now before the court there can be no pretense that the making of the note was the act of the principal. Its execution and acceptance were well known to both parties to be a departure from the agency and in hostility to the principal.

Could Herron have maintained an action against the insurance company after he accepted the note of Bradfield and Leach and before it matured? His suing the company before the note matured would have violated his obligation to the makers. Would a complainant in a court of conscience be granted relief upon a case his own statement of which showed that his suit involved a violation of his obligation, even to a third party? One thing is certain, if Herron could not have sued before the maturity of the note, he cannot maintain this cause. Another thing, Herron did not have two debts. The insurance company was not indebted to him on the binding receipt, $322, bearing six per centum interest, and Bradfield and Leach on the note for a like sum, bearing eight per centum interest. The note was a perfectly binding obligation on the makers, because they would have been estopped to make any defense, such as the infirmity we are about to mention. The note, however, was given for one of two considerations, either, as we contend, because its legal effect was to release the insurance company, which was a perfectly valid transaction, or it was given in consideration of an agreement by Herron in violation of public policy, an agreement to aid defaulting agents in deceiving their principal, a contract condemned by good morals. Herron claims that the note was not given in consideration of the release of the appellant, but (admitting that it did not bind the insurance company or increase its liability, for in the execution of the note the-

makers were not representing the company) he claims that the note was given to and accepted by him as a personal favor to Bradfield and Leach, to enable them to impose upon appellant and keep from the company a knowledge of their default. If this were true, and it be held that the transaction did not release the company, then Herron, in maintaining this suit, would be pleading the turpitude of his own contract. The payee of a note is estopped to plead his turpitude in the transaction out of which it grew, as well as the maker. Estoppels are mutual. Will Herron be permitted to claim that the note which he accepted was made on a base consideration? The makers could not do so without the aid of a statute. Has the payee greater rights?

It is said that we have several Mississippi decisions to the effect that the mere acceptance of the note of the agent for the principal's debt is not a release of the principal, and we are referred to *Guion* v. *Doherty*, 43 Miss., 554; *Clopton* v. *Matheny*, 48 Miss., 285, and *Brooks* v. *Barkley*, 72 Miss., 320. All of these cases arose out of the married woman's law formerly administered in this state under which the plantations of married women were regarded as held in trust and liable, only because of the trust, to certain classes of creditors and, besides, the agency of the husband was statutory, and was imposed upon the relation of husband and wife. Several things are certain in respect to all of them. In none of them was there a "dickering" between the creditor and the agent against the interest of the principal; in none of them was there a settlement between the principal and the agent in which the agent was paid by the principal where he would not have been settled with had the creditor not have acted as he did; and in all of them the court was justified in regarding the giving of the note itself as the act of the principal, although signed by the agent, and in treating the note as a mere memorandum of the sum due and time fixed for payment; and in all of them the principal obtained all of the advantages of the transaction, and principal

and agent were living together in the closest of human rela-- tions.

The binding receipt provides that in case the application for insurance be rejected, "all moneys paid hereunder shall be returned upon the delivery of the receipt." This made the money paid by Herron to Bradfield and Leach a trust fund, and the obligation was to return the identical money. It does not weaken the argument we are about to make that Herron would have received and could have been compensated with other money. Bradfield and Leach, therefore, had in their hands, not having paid it to the company, specific trust funds which, upon the rejection of the application for insurance, belonged to Heron. They were as much liable to Herron for the embezzlement of the funds as was the insurance company; in fact, they were primarily liable, and if Herron had at once, without "dickering" with the embezzlers, exacted payment of the company, it could have held Bradfield and Leach responsible, and had Bradfield and Leach set about to make fraudulent conveyances of their property to avoid liability for the money, the insurance company, before paying Herron, could have enjoined them. *Bowen* v. *Hoskins*, 45 Miss., 183. The insurance company had an equitable right, at least, to impose the liability primarily on Bradfield and Leach, certainly as between themselves. Something, therefore, akin to the relation of principal and surety existed between them. Of this, Herron had notice. for he actually knew the facts, and is charged with knowledge of the law; and yet, in order to do Bradfield and Leach (the principals) a personal favor, he, without the consent of the insurance company (the surety), granted an extension of time to Bradfield and Leach, and thereby released the company. Even if the technical relation of principal and surety did not exist between Bradfield and Leach and the company in respect to the obligation of the binding receipt, yet the law of principal and surety, by which an extension of time by the creditor to the principal, without the consent of the surety, releases the latter,

illustrates the principle of right and justice for which we contend, and the principle, which has its foundation in justice and right, is as applicable to the case now before the court as it would be in any state of facts that could be presented.

Another view: Herron did not, after accepting the note ·of Bradfield and Leach, have two debts, one against the company and another against the makers of the note.    If this be true, then, putting the case most strongly for complainant, after the note was accepted the insurance company's liability (if liable at all) was the liability of a guarantor of the debt, and in such case the extension of· thirty days' time granted Bradfield and Leach by Herron upon the maturity of the note without the company's consent was a release and discharge of the company.

*Brame & Brame*, for the appellee.

That the insurance company is bound by the acts of Bradfield and Leach, in fact, that they were its agents, cannot be disputed under the fact of this case and the authorities.    *Goode* v. *Insurance Co.*, 30 L. R. A. (Va.), 842; Story on Agency (9th ed.), sec. 14; 1 May on Insurance (3d ed.), secs. 154, 154*a*; 2 Wood on Insurance (2d ·ed.), sec. 433.    *Bodine* v. *Exchange Insurance Co.*, 51 N. Y., 117, s.c. 10 Am. Rep.·, 566: *Arff* v. *Star Insurance Co.*, 125 N. Y., 57, s.c. 10 L. R. A., 609; 47 L. R. A., 201. *Ib.*, 641; 65 Am. Dec., 553; 82 Am. Dec., 719; 44 Pa., 259; 72 Iowa, 276; *Rivara* v. *Insurance Co.*, 62 Miss., 720.

All questions of fact were resolved by the chancery court in favor of complainant, and since its decree is well supported by the evidence, it will not be reversed on the facts.    We are to deal, therefore, with the case as made out by complainant's testimony.    It is almost universally established in all the states of the Union and in England, certainly in Mississippi, that the taking by a creditor of a note from a third person for a debt is not payment unless so agreed.    18 Am. & Eng. Enc. L. (1st ed.), 167–171; 69 Am. Dec., 123, and notes; 79 Am. Dec.,

709, and notes; 97 Am. Dec., 419, and notes; 8 Am. St. Rep., 841, and notes; *Taylor* v. *Connor*, 41 Miss., 722; 50 Am. St. Rep., 717, and notes; *Guion* v. *Doherty*, 43 Miss., 554; 2 Parsons on Contracts, 136; *Curtis* v. *Hubbard*, 9 Metc., 328; *Thurston* v. *Blanchard*, 7 Pick., 18; *Foote* v. *Yerger*, 48 Miss, 62; *Clopton* v. *Matheny*, 48 Miss., 285; *Buckingham* v. *Walker*, 48 Miss., 633; *Wadlington* v. *Covert*, 51 Miss., 631; *Cook* v. *Ligon*, 54 Miss., 368; *Brooks* v. *Barkley*, 72 Miss., 320.

Conceding the general rule to be as we have stated it, counsel claims that this case is an exceptional one because the note of the third person in this instance was that of an agent. In support of this proposition, he cites the following: (1) The last sentence in paragraph 2, 16 Am. & Eng. Enc. L., 881, and note, and (2) the last paragraph in section 669 in Mecham on Agency.

If the court will examine the reference in Mecham on Agency it will be seen that it is a part of chapter 5, which, beginning with section 695, discusses the liability of an undisclosed principal, and the right of a creditor to make an election to hold the principal or the agent, and the effect of an election when made. The question involved in this case is really not involved or discussed. We ask the court to read the entire section and the context.

Let us now examine the other citation. Under the title of "Novation," the following language is used by the writer of the article: "Where the creditor takes the note of an agent with knowledge of the liability of the principal, the debt is regarded as paid." 16 Am. & Eng. Enc. L., 881. The only authorities there referred to are in note 3. *Perkins* v. *Cady*, 111 Mass., 318; *Ames* v. *Tucker*, 9 Mo. App., 95; *Wyatt* v. *Marquis*, 3 East, 147.

In the case of *Perkins* v. *Cady*, 111 Mass., the following is the syllabus in full: "If the seller of a chattel accepts the promissory note of the buyer's agent, knowing him to be such

·agent, in payment, intending to receive it as payment, and to give an exclusive credit to the agent, it operates as payment, :and upon its dishonor he cannot recover the price of the chattel from the buyer.'' This shows how wide of the mark the cita-tion is. .

In the case of *Ames* v. *Tucker*, 9 Mo. App., 95, (an inferior ·court), the following is the syllabus in full: '' Where a creditor, with knowledge of the principal's liability, takes the agent's individual note without taking any steps indicative of an intent to hold the principal, this is equivalent to a discharge of the . principal as a matter of law.''

In that case, as in *Perkins* v. *Cady*, and in most of the cases cited in the above section in Mechem on Agency, the court was dealing with a purchase of personal property by an agent. We have examined 3 East Reports, and there is no such case in it as *Wyatt* v. *Marquis*. These are the only three cases cited by the writer of the article on '' Novation,'' in the 16 Am. & Eng. Enc. L., in support of the statement that the taking of the note of an agent constitutes an exception to the general rule that taking the note of the debtor, or that of a third person, is not to be considered payment, unless there is proof that it was so intended by the parties at the time, and that the original debt should be discharged.

The only other case mentioned in the note to Mechem is *Lovell* v. *Williams*, 125 Mass., 439, which was an action against a married woman for goods sold and delivered to her husband, as her agent, and used on her farm. The court says: '' The ground upon which the plaintiff bases his claim is that the hus-band was carrying on the farm as the agent of the defendant, and that he has the right to resort to her as the undisclosed principal. The husband gave his note for the goods and closed the account, and afterwards the plaintiff alleges that he dis-covered, for the first time, that he had bought them as agent for his wife.'' The court, in its opinion, uses this language: '' The rule in Massachusetts is, that, if a negotiable promissory

note is given for a pre-existing debt, the presumption is that the creditor intended to receive it in payment of such debt. (Reverse of rule in Mississippi.)    But this presumption may be rebutted and controlled;. and the fact that such presumption would deprive the creditor taking the note of the substantial benefit of some security, such as a mortgage, guaranty or the like, has been held to be sufficient evidence to meet and repel the presumption.''

It is next argued on behalf of the defendant that the complainant, upon his own testimony, is not entitled to recover. This position, as we understand it, is based either upon the doctrine of estoppel, or that complainant did not come into court with clean hands.    It is urged that Herron was assisting the agents to defraud the principal.    In the first place, this involves the admission of the fraud of the agents.    But how it is possible to believe that Herron assisted these men in any fraud, we are utterly unable to see.    After they had embezzled the money, he simply waited on them, hoping that they would pay it back, and trying to induce them to pay it, as was their duty.    In this there was no wrong done to defendant.    The testimony of Willcox shows that he knew, long before the transaction of the giving of the note to Herron, that Bradfield had collected the money, and knew that he was in default in failing to send it to him at once.    When Bradfield went to see Herron, to settle the matter in some way (some time in December), Herron did not know it, if it be a fact, that the company, or Willcox, was ignorant of Bradfield's defalcation.    He had a right to suppose that the company knew all about the transaction and that it would protect itself in dealing with its agents. In view of this, it seems to us absurd to urge that Herron's action in the matter gave Bradfield and Leach an opportunity to make settlement with the company and escape.    In dealing with the agents, it was not his duty to look out for the company.    He was trying to get his money, and it was the duty of the company to protect itself, and to protect him too.

We do not believe that it is true that, after giving the note, in December, 1897, the company had settlements with Bradfield and Leach and paid them money, and in this way lost the means or opportunity to protect itself. It is true Willcox said that he could have protected himself, but we asked for the specific settlements and when they were made, and we received in reply only general, evasive answers. It is absolutely incredible that Willcox had any settlements with Bradfield and Leach and paid them money after he learned that they had collected this money and issued this binding receipt, and he says that he learned this several weeks after the application, say about September 1, 1897. Why should he have settlements with them and pay them without asking for the receipt itself to be returned? We say again that, upon the evidence in this record, it is not true that any such settlements were made. But, if any such settlements were made, the defendant, or Willcox, was relying upon the truthfulness of the statement of the agents, Bradfield and Leach, wherein they represented that they had settled with Clay or Herron, and had "taken care" of him. Herron made no representations on which they relied. He was trying persistently to get his money from these faithless agents of the company.

We will conclude this brief by asking the question: Who should lose in this case—the principal, whose agents have violated the terms of the agency, and the criminal law, by appropriating money received by them in the regular course of business, or an innocent third party, who, in good faith, advanced his money and dealt with the principal through these agents, who have proved faithless to their trust?

It is stated by counsel that the note of Bradfield and Leach was given for the purpose of releasing the company, and represented a valid transaction, or "it was given in consideration of an agreement by Herron in violation of public policy—an agreement to aid defaulting agents in deceiving their principal— a contract condemned by good morals." It is difficult for us

to conceive of anything that Herron did which was in violation of public policy or good morals. He was in the attitude of an innocent man holding a debt against the insurance company which was under obligation to refund to him promptly the money which he had advanced in dealing with the company in the usual and customary way. The agents of the company had embezzled the money. When the policy of insurance was rejected, as was natural, he applied through them for a return of the money. They stated to him that they had used it, and asked him to wait a short while, stating that they would raise the money and pay it back to him themselves. Of course, it was immaterial to him from what source the money was derived which was to be paid back to him. He was willing for the payment to be made by Willcox or by the officers in New York, or by the agents with whom he had dealt. These agents had used the money, and as between themselves and the company, there was a moral obligation resting upon them to pay the debt. Herron had nothing to do with this. He had not participated in their use of the money, and did not know until long afterwards that they had embezzled it. So that, so far as he was concerned there was no legal or moral obligation to ask that Bradfield and Leach, as individuals, should pay the money rather than the insurance company direct. How it can be said that he was guilty of any breach of good faith in waiting a short while on these men to pay the money, we confess ourselves utterly unable to see. We deny as a matter of fact that Herron did anything to enable these agents "to impose upon appellant and to keep from the company a knowledge of their default." He did not enable them to impose upon the company, because they had already imposed upon it by embezzling the money, and he did not enable them to keep from the company a knowledge of the default, because the fact of the default was already known to the company. Willcox testifies that he learned "several weeks" after the application, which was made in August, that the agents had collected the money and issued

the binding receipt, and that he wrote to them several times, urging that the money should be forwarded, as was their duty. He therefore knew several months before the agents had the transaction with Herron that these men had converted or embezzled the money.

With all deference to counsel, we submit that it is equally preposterous to invoke for the protection of the insurance company. in this case the rule applicable to a surety who is released by the action of the creditor in giving time to the principal debtor. The illustration does not illustrate, for the simple reason that the cases are not analogous. Here the insurance company does not in any sense occupy the position of a surety for this debt. It is itself the debtor. It owes the money to Herron, and is under a primary obligation to pay it. While it would have a right of action against its unfaithful agents for the conversion of the money, this does not in anywise affect its obligation to pay its debt to Herron in accordance with the terms of the contract.

How can it be said that the hands of the company were tied in respect to any proceedings against its agents, when the arrangement under which they induced Herron to desist for a short while from legal steps on their promise personally to get up the money and pay it? The liability of the company to Herron was already fixed and definite and certain, and the right of the company to proceed against its agents to compel them to pay over the money was a different question, and was not affected in any way by the arrangement made by the agents with Herron, unless it be true that it was the intention and understanding that the company should be absolutely released by the giving of the note, and this the chancellor has found was not the case.

Argued orally by *R. P. Thompson* and *R. H. Thompson* for appellant, and by *L. Brame, Jr.*, and *L. Brame* for appellee.

TERRAL, J., delivered the opinion of the court.

This is a suit by attachment in chancery; under § 486, code 1892, to recover of the appellant the sum of $322, with interest. Matthew Clay, Jr., applied to a soliciting agent of the insurance company for a policy upon his life in the sum of $10,000—payable, $7,000 to appellee and $3,000 to Matthew Clay and Hattie K. Clay—upon which application appellee, Herron, paid to said soliciting agent of the company $322, being the sum of the first annual premium if insurance should be effected, and took a receipt therefor, signed by the secretary of the company, and stipulating that said company should repay said sum of money to appellee if said insurance should not be effected. This receipt was signed by the secretary of the company and countersigned by L. T. Bradfield, as collecting agent, and delivered to Herron. The company having declined to take the risk offered it, this suit is brought to recover the money agreed to be returned in such event. The insurance company resists the recovery of the money specified in the receipt on several grounds.

1. It is said that L. T. Bradfield, who, as collecting agent, countersigned the receipt for the $322 issued by the company, was not in fact the agent of said company, but was merely the agent of J. S. Willcox, the general agent of the company at Montgomery, Alabama. It is a general rule that an agent clothed with a personal trust cannot delegate his authority to another without some express provision for that purpose, yet this rule is subject to exceptions, and, among them, to cases where it is understood by the parties that the appointment of subagents is to be the mode in which the particular business would or might be done, or where, from the nature of the agency, a subagent is necessary; and it abundantly appears from the record that the appellant company expected that Willcox, its agent for the State of Alabama, would employ subagents, like Bradfield, for the conduct of the business committed to him. It would seem improbable that Willcox, as

sole agent of the company for the State of Alabama, could conduct a business of insurance of any magnitude without the help of subagents.    May on Insurance, sec. 154, says:  "General agents of insurance companies, authorized to contract for risks, receive and collect premiums and deliver policies, may confer upon a clerk or subordinate authority to exercise the same powers.    The service is not of such a personal character as to come under the maxim, '*Delegatus non potest delegare.*'" An admirable statement of the principles of law governing the subject may be found in Story on Agency, sec. 14.    But here the application of Clay was vouched for by Bradfield as soliciting agent, and so the company had distinct knowledge that Bradfield was assuming to act as its agent; and his authority to so act was clearly recognized by it in the consideration given to the application, which was declined on other grounds than a want of authority in Bradfield.

2. Secondly, it is said that, if Bradfield be taken to be the agent of the company, and if the receipt countersigned by him be binding upon the company, still said company has been discharged from said duty by the act of appellee, Herron, in taking the note of Bradfield and Leach in discharge of its payment.    Bradfield, and Leach, who was assisting Bradfield in soliciting business of insurance, testified that they gave their note to Herron in discharge of the obligation of the company, and that it was accepted as such by appellee, while appellee distinctly insists that he did not agree to take the note of Bradfield and Leach in discharge of the obligation of the company; and the finding of the chancellor solved that contention in favor of appellee, and we see no ground for disturbing his conclusion on that point.

3. But it is also contended that the insurance company is discharged from the repayment of the $322, because it is said that Herron, by awaiting the effort of Bradfield and Leach to pay him the money due him from the company, misled the company, to its detriment.    The insistence is that Bradfield

and Leach committed a fraud upon appellant, and that Herron, by his conduct, involved himself in such fraud. In our view of the matter, however, the record discloses no such culpability on the part of Herron. The insurance company, or Willcox, its general agent, knew that Bradfield, as soliciting agent, had all the authority belonging to such agent, was authorized to receive applications for insurance, collect in advance an amount equal to what would be the first annual premium, issue a binding receipt, signed by the secretary of the company, stipulating for a return by the company of said amount if the risk was declined. In truth, the company was bound by all the acts of its agents done within the scope of their authority, and there was no duty imposed upon Herron to inform it of such acts. That Willcox, the general agent of the company, may have been deceived by Bradfield and Leach may be true, but wherein Herron is responsible to the insurance company for such deception cannot, in our opinion, be deduced from this record.

*Affirmed.*